# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **TONYA M. CATRON,** ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:08cv00043 |
| ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | By:   PAMELA MEADE SARGENT |
| Defendant. ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Tonya M. Catron, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2008). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Catron protectively filed her initial application for SSI on February 6, 2006, alleging disability beginning February 1, 2006, based on back problems, anxiety and a learning disability. (Record, ("R."), at 56-59, 71.) The claim was denied initially and on reconsideration. (R. at 32-34, 38, 39-41.) A hearing before an Administrative Law Judge, ("ALJ"), was held on March 5, 2008, at which Catron was represented by counsel. (R. at 248-73.)

By decision dated March 26, 2008, the ALJ denied Catron's claim. (R. at 16-25.) The ALJ found that Catron had not engaged in any substantial gainful activity since February 6, 2006. (R. at 18.) The ALJ found that the medical evidence established that Catron had severe impairments, namely back pain, depression, anxiety, impaired intellectual functioning, illiteracy and a learning disorder, but he found that Catron's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ also found that Catron had the residual functional capacity to perform less that

-2-

a full range of medium work.[1] (R. at 20.) Specifically, the ALJ found that Catron should never climb ladders, ropes or scaffolds, should avoid hazards such as heights and dangerous machinery and was limited to simple, easy-to-learn, one- or two-step, repetitive tasks. (R. at 20.) The ALJ found that Catron had no past relevant work. (R. at 23.) Based on Catron's age, education and residual functional capacity and the testimony of a vocational expert, the ALJ found that Catron could perform jobs which existed in significant numbers in the national economy, such as work as an office machine tender, a price marker, an assembler and a bench worker. (R. at 24.) Therefore, the ALJ found that Catron was not under a disability as defined in the Act at any time through the date of his decision, and he found that she was not eligible for benefits. (R. at 24-25.) *See* 20 C.F.R. § 416.920(g) (2008).

After the ALJ issued his decision, Catron pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 5-7, 11.) Catron then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2008). The case is before this court on Catron's motion for summary judgment filed January 27, 2009, and the Commissioner's motion for summary judgment filed February 27, 2009.

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2008).

*II. Facts*

Catron was born in 1965, (R. at 57), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). Catron quit school after the ninth grade, and she has no past relevant work experience. (R. at 74, 123, 253.) Catron testified that she could not read and could write only a "little." (R. at 253.) Catron also stated that she attended special education classes in school. (R. at 157, 253.)

In rendering his decision, the ALJ reviewed records from Stone Mountain Health Services; Frontier Health; Dr. Kevin Blackwell, D.O.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Donna Abbott, M.A., a licensed senior psychological examiner; Howard S. Leizer, Ph.D., a state agency psychologist; and Joseph Leizer, Ph.D., a state agency psychologist.

B. Wayne Lanthorn and Donna Abbott performed a psychological consultative evaluation on Catron at the request of the state agency on March 15, 2006. (R. at 144-58.) Catron told Lanthorn that she suffered from anxiety and depression. (R. at 144-45.) Catron said that she went to only the ninth grade in school and that she was in special education in all subjects all through school. (R. at 145.) She stated that she could not learn to read. (R. at 145.) Catron stated that she just wanted to stay at home in her room and not go anywhere. (R. at 146.) On the Wechsler Adult Intelligence Scale – Third Edition, ("WAIS-III"), Catron attained a verbal IQ score of 67, a performance IQ score of 75 and a full-scale IQ score of 68, which Lanthorn noted placed her in the extremely low range of current intellectual functioning. (R. at 147.) Lanthorn noted that Catron's effort on the testing was "marginal." (R. at 148.)

-4-

Lanthorn diagnosed Catron as suffering from mild mental retardation. (R. at 148.) Lanthorn stated that Catron "was found to be functioning in the upper limits of the Extremely Low range of intelligence; however, potentially this is slightly higher as motivation seemed somewhat marginal.." (R. at 148.) Lanthorn also stated that "[c]onsidering quality of verbalizations, her potential may be higher." (R. at 148.) He placed Catron's Global Assessment of Functioning, ("GAF"),[2] score at 60.[3] (R. at 148.) Lanthorn stated that Catron could attend and concentrate and should be able to maintain simple routine. (R. at 148.) Lanthorn stated that Catron's general adaptation skills showed mild to moderate limitation relating to below average intellectual ability. (R. at 148.) Lanthorn stated that Catron would have difficulty working around others and in handling stress. (R. at 148.) Abbott's assessment was identical to Lanthorn's. (R. at 152-58.)

On April 11, 2006, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on Catron's condition. (R. at 163-75.) Leizer stated that Catron suffered from mild mental retardation. (R. at 167.) Leizer stated that Catron experienced mild restrictions of activities of daily living and mild difficulties in maintaining social functioning. (R. at 173.) He also stated that Catron experienced moderate difficulties in maintaining concentration, persistence or pace. (R. at 173.) Leizer confirmed that intelligence testing showed that

---

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[3]A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

Catron suffered from mild mental retardation, but he stated that her potential may be higher due to a marginal effort. (R. at 175.) Joseph Leizer, Ph.D., another state agency psychologist, reviewed and affirmed Howard S. Leizer's PRTF on May 31, 2007. (R. at 163.)

Howard S. Leizer also completed a Mental Residual Functional Capacity Assessment of Catron's condition on April 11, 2006. (R. at 160-61.) Leizer found that Catron was moderately limited in her ability to understand, remember and carry out detailed instructions, to sustain an ordinary routine without special supervision, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 160-61.) Joseph Leizer reviewed and agreed with Howard S. Leizer's assessment on May 31, 2007. (R. at 162.)

On May 25, 2006, Dr. Kevin Blackwell, D.O., performed a consultative examination on Catron at the request of the state agency. (R. at 176-79.) Catron complained of few, if any physical problems. (R. at 176.) She did state that she suffered from panic attacks. (R. at 176.) Dr. Blackwell did not evaluate her psychological symptoms. (R. at 179.)

Catron was seen by Kellie Brooks, a family nurse practitioner at Stone Mountain Health Services, on August 11, 2006, complaining of a lot of stressors. (R. at 186.) Brooks diagnosed Catron as suffering with anxiety and depression and prescribed Lexapro. (R. at 186.)

On January 12, 2007, Catron began mental health counseling and treatment

with Shannon Moles, B.A., at Frontier Health. (R. at 245.) Catron reported increasing depression and anxiety symptoms for the previous several months. (R. at 245.) Catron stated that she spent most of her time in her bedroom because it was the only place she felt safe. (R. at 245.) She also complained of performing the same tasks over and over throughout the day and washing her hands repeatedly. (R. at 245.) Catron also reported hearing the voice of her dead ex-husband taunting her. (R. at 245.) She stated that she had never worked outside of the home and that she could not read or write. (R. at 245.) Moles diagnosed Catron as suffering from panic disorder with agoraphobia and post-traumatic stress disorder. (R. at 243.) Moles placed Catron's GAF score at 50,[4] with that also being her highest GAF in the previous six months. (R. at 243.)

Catron was seen by Brooks, with Stone Mountain Health Services, again on January 23, 2007, complaining of nervousness, anxiousness, anxiety and increased stress. (R. at 208.) Brooks prescribed Cymbalta. (R. at 208.)

Catron saw Melinda Woliver, B.A., with Frontier Health on February 7, 2007. (R. at 241.) Catron reported staying home most of the time and suffering from panic attacks when she attempted to go out to public places. (R. at 241.) Catron reported feeling nervous and unable to sleep. (R. at 241.) Woliver reported that Catron appeared clinically stable. (R. at 241.)

---

[4]A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

Case 2:08-cv-00043-JPJ-PMS   Document 16   Filed 05/20/09   Page 7 of 16   Pageid#: 62

Catron saw Moles again on March 13, 2007. (R. at 240.) Catron reported that she had been under a lot of stress recently due to her daughter's hospitalization for alcohol and drug abuse. (R. at 240.) Catron stated that her sleep had improved, but that she continued to suffer from at least two anxiety attacks a week. (R. at 240.) Moles stated that Catron appeared clinically stable. (R. at 240.) Moles stated that Catron appeared anxious. (R. at 240.) On April 4, 2007, Catron reported continuing to suffer from significant panic attacks. (R. at 239.) Catron also reported problems sleeping, completing tasks due to lack of concentration and symptoms of obsessive compulsive disorder. (R. at 239.) Moles stated that Catron appeared anxious. (R. at 239.)

Catron also saw Dr. John Gergen, M.D., a psychiatrist on April 4, 2007. (R. at 237-38.) Catron reported increasing symptoms of panic attacks, poor sleeping, obsessive/compulsive behavior and depression over the previous eight months. (R. at 238.) Catron complained of crying a lot and staying isolated in her home or room. (R. at 237.) Catron reported that she never learned to read or write despite attending school until she was 16. (R. at 237.) Dr. Gergen noted that Catron appeared distraught and worn. (R. at 237.) Dr. Gergen did not assess Catron's cognitive function in depth, but he noted that her lack of reading skills reflected "some significant level of impairment." (R. at 237.) Dr. Gergen diagnosed Catron as suffering from anxiety panic disorder, obsessive compulsive disorder, mood disorder, a learning disability and attention deficient disorder. (R. at 237.) Dr. Gergen placed Catron's GAF score at 50. (R. at 237.) Dr. Gergen prescribed alprazolam, fluoxetine and Seroquel to treat Catron's symptoms. (R. at 237.)

On April 25, 2007, Catron told Moles that she could see some improvement

-8-

since starting on medication. (R. at 236.) Catron reported sleeping better and being able to concentrate better. (R. at 236.) Catron also saw Dr. Gergen again on this date. (R. at 235.) Dr. Gergen continued her medications. (R. at 235.) On May 8, 2007, Catron continued to report improvement in her symptoms on medication. (R. at 234.)

On May 17, 2007, Dr. Blackwell performed another consultative examination of Catron at the request of the state agency. (R. at 196-98.) Catron's main physical complaint was occasional back pain. (R. at 196.) Catron also complained of suffering from psychological problems, sleeping problems and a learning disorder. (R. at 196.) Dr. Blackwell limited Catron to occasionally lifting items weighing up to 50 pounds and frequently lifting items weighing up to 25 pounds. (R. at 198.) He did not evaluate her learning capabilities or psychological impairments. (R. at 198.)

On June 25, 2007, Catron reported effective treatment of her symptoms with medication. (R. at 230.) Moles noted that Catron appeared mildly anxious and was clinically stable. (R. at 230.) Catron also saw Joyce F. Thompson, a family nurse practitioner with Frontier Health, on this date. (R. at 229.) Thompson noted that Catron appeared mildly depressed and mildly anxious. (R. at 229.) She increased Catron's dosage of fluoxetine. (R. at 229.)

On July 30, 2007, Catron complained of increased nervousness and anxiety since decreasing her alprazolam dosage. (R. at 227.) On August 29, 2007, Catron reported doing well. (R. at 226.) Catron saw Thompson again on September 19, 2007, and reported she was doing fairly well with no overwhelming anxiety or depression. (R. at 224.) Catron requested an increase in her alprazolam, which Thompson denied.

(R. at 224.) On October 16, 2007, Catron reported that she continued unable to get out in public places without significant panic. (R. at 221.) Moles described Catron's mood as "somewhat anxious." (R. at 221.) On November 26, 2007, Catron reported doing better recently. (R. at 218.) Catron stated that she was able to complete her daily tasks with no problems or concerns. (R. at 218.)

On December 28, 2007, Catron reported increased anxiety. (R. at 217.) Catron stated that she had not been out of her home in more than a week. (R. at 217.) She also stated that she had not bathed since an incident in which she experienced an "overwhelming feeling" that someone was watching her in the shower. (R. at 217.) Her appearance reflected the lack of hygiene. (R. at 217.) Thompson increased Catron's fluoxetine and added Vistaril to her medications. (R. at 216.)

On January 28, 2008, Catron continued to report not doing well with increased anxiety. (R. at 213.) Catron reported feelings of extreme anxiety when in crowded places. (R. at 213.) Linda Anderson-Quinonez, B.A., completed an assessment of Catron's condition on this date. (R. at 211-12.) Anderson-Quinonez noted that Catron suffered from a below average intelligence and placed her GAF score at 50. (R. at 211.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe

-10-

impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 26, 2008, the ALJ denied Catron's claim. (R. at 16-25.) The ALJ found that Catron had not engaged in any substantial gainful activity since February 6, 2006. (R. at 18.) The ALJ found that the medical evidence established that Catron had severe impairments, namely back pain, depression, anxiety, impaired intellectual functioning, illiteracy and a learning disorder, but he found that Catron's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ also found that Catron had the residual functional capacity to perform less that a full range of medium work. (R. at 20.) Specifically, the ALJ found that Catron

should never climb ladders, ropes or scaffolds, should avoid hazards such as heights and dangerous machinery and was limited to simple, easy-to-learn, one- or two-step, repetitive tasks. (R. at 20.) The ALJ found that Catron had no past relevant work. (R. at 23.) Based on Catron's age, education and residual functional capacity and the testimony of a vocational expert, the ALJ found that Catron could perform jobs which existed in significant numbers in the national economy, such as work as an office machine tender, a price marker, an assembler and a bench worker. (R. at 24.) Therefore, the ALJ found that Catron was not under a disability as defined in the Act at any time through the date of his decision, and he found that she was not eligible for benefits. (R. at 24-25.) *See* 20 C.F.R. § 416.920(g).

Catron argues that the ALJ erred by improperly determining her mental impairment did not meet or equal the listed impairment for mental retardation found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-10.) Catron also argues that the ALJ erred in his mental residual functional capacity determination. (Plaintiff's Brief at 10-14.) Based on my review of the record, I agree, and I recommend the court vacate the Commissioner's denial of benefits and remand for an award of benefits.

The ALJ's finding that Catron's mental impairment did not meet the requirements of § 12.05C is based on his finding that Catron did not have a valid test score placing her IQ in the 60 to 70 range. I find, however, that the ALJ's rejection of the results of the only intelligence testing contained in the record is improper.

To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, §

-12-

12.05C, a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function. The Secretary's regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *See Townsend,* 581 F. Supp. at 159. The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (2008). *See Flowers v. U.S. Dep't. of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

In this case, the ALJ specifically found that Catron had physical and other mental impairments which imposed significant work-related limitations of function, namely back pain, depression and anxiety. (R. at 18.) It also is clear from the record that Catron's problems with intellectual functioning have been lifelong problems. Catron completed only through the ninth grade in school and attended special education classes. Catron did not learn to read and writes only a little. Furthermore, the only intelligence testing contained in this record places Catron's IQ score in the 60-70 range. The ALJ rejected these IQ scores as invalid based on Catron's poor effort and the verbal abilities reported by the examiner. (R. at 20.) Neither Lanthorn nor Abbott, who relied on these IQ scores in their assessments of Catron's mental impairments, stated that Catron's IQ scores were invalid. While both reflected that

-13-

Catron's effort was marginal and that her potential might be higher, both also diagnosed her with mild mental retardation based, at least in part, on these scores. The diagnosis of mild mental retardation also was affirmed by the state agency psychologists. Furthermore, neither of these psychologists stated that Catron's IQ test scores were not valid. That being the case, I hold that the ALJ was not free to simply ignore the uncontradicted expert psychological opinions in favor of his own opinion on a subject that he is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

Based on the above, I find that substantial evidence does not exist to support the ALJ's finding that Catron's mental impairment did not meet the requirements of the listed impairment for mental retardation. Furthermore, I find that the uncontradicted evidence shows that Catron's mental impairment met the requirements of § 12.05C, and an award of benefits is proper based on the record before the court.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the ALJ's finding that Catron's mental impairment did not meet or equal the listed impairment for mental retardation;

2. Substantial evidence does not exist to support the ALJ's finding that Catron was not disabled under the Act; and

3. The uncontradicted evidence shows that Catron's mental

-14-

impairment meets the requirements for the listed impairment for mental retardation in §12.05C.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court grant Catron's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand Catron's claim for an award of benefits.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

-15-

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 20th day of May 2009.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE